BEST BUS JOINT VENTURE *et al.*, Plaintiffs-Appellants, v. THE BOARD OF EDUCATION OF THE CITY OF CHICAGO *et al.*, Defendants-Appellees (Alltown Bus Service, Inc., *et al.*, Intervenors and Defendants-Appellees).

First District (5th Division)   No. 1—96—2927

Opinion filed May 9, 1997.

HOFFMAN, J., specially concurring.

Lee J. Schwartz, of Chicago, for appellants.

Joseph A. Cari, Jr., John P. Buckley, and Theodore E. Harman, all of Ungaretti & Harris, of Chicago, for appellees.

JUSTICE SOUTH delivered the opinion of the court:

Plaintiffs, Best Bus Joint Venture (Best Bus), Laidlaw Transit, Inc. (Laidlaw), Willett Motor Coach Co. (Willett), Robinson Bus Service, Inc. (Robinson), Express Latino, Inc. (Express), Latino Express, Inc. (Latino), and B&B Coach (B&B) challenged the Board of Education of the City of Chicago's (the Board's) award of bus contracts for the 1996-97 through 1998-99 school years and sought permanent injunctive relief. At issue was the Board's application of a 2% local business preference (2% LBP) to Best Bus; the validity of such a preference; and the Board's award of bus contracts.

In count I, plaintiffs sought an order compelling the Board to apply the 2% LBP based upon the entity plaintiffs claimed would actually provide service (Willett), rather than the entity which participated in the bid (Laidlaw). In the alternative, in count II, plaintiffs sought to invalidate the 2% LBP. In count VII, plaintiffs claimed that the Board's action must be reversed as "palpable error, amounting to constructive fraud." In count VIII, plaintiffs claimed that Board Rule 5.5 violates due process and equal protection.

Plaintiffs filed a complaint only three weeks before the start of the school year. They sought a preliminary injunction, and a hearing was held by the trial court on August 12, 14 and 16, 1996. Both the Board and codefendant RR Joint Venture (RR) raised the affirmative defense of estoppel.

The parties entered into a number of stipulations. The parties

also agreed to the authenticity of a number of documents. The stipulations and documents are as follows.

On January 24, 1996, the Board adopted Rule 5.5, establishing a 2% LBP for contracts over $10,000. Pursuant to Board Rule 5.5, a company must meet the following four requirements in order to qualify for the 2% LBP: (1) be authorized to do business and doing business in Chicago; (2) be located in the City of Chicago; (3) have the majority of its regular full-time work force in Chicago; and (4) be subject to City of Chicago taxes.

In March 1996, the Board let out for bid contracts for provision of school bus services for the 1996-97 through 1998-99 school years, bid number 96—130050. The Board notified prospective bidders of the bid period and pre-bid meeting by a letter dated March 12, 1996. All plaintiffs and defendants present at the preliminary injunction hearing received the letter. Bid specifications were made available to the public on March 15, 1996.

The pre-bid meeting was held on March 21, 1996. Representatives from all of the plaintiffs and defendants present at the preliminary injunction hearing attended the March 21, 1996, pre-bid meeting.

A list of revisions and additions from the previous contract was made available to the public by the time of the pre-bid meeting. The list of revisions and additions noted the 2% LBP on page 9 of the contract. The terms and conditions of the 2% LBP were described during the March 21, 1996, pre-bid meeting and were set forth on page 9 of bid number 96—130050. The terms and conditions of the 2% LBP were set forth in the bid prepared and proposed on behalf of Best Bus.

Best Bus submitted a bid to provide services to transport students for the Board. Laidlaw was a member of Best Bus, but Willett was not. Laidlaw was not a local company as defined in the bidding specifications. As applied by the Board, Best Bus was not qualified as local under Board Rule 5.5 and the bids specifications because the majority of Laidlaw's employees work outside Chicago and, therefore, the majority of employees of the venturers in the joint venture also work outside Chicago.

At the meeting of the Board on July 24, 1996, the bus service contracts were awarded. Although Best Bus was the lowest bidder for type I buses, when the 2% LBP was considered, RR became the low bidder for these buses and received the award.

Diane Minor, chief purchasing officer in the Chicago public school system, testified that when she became the Board's chief purchasing officer she brought with her knowledge regarding the city's use, ap-

plication of and experience with a 2% LBP in its competitive bidding process, and she wished to apply that knowledge and those benefits to purchasing for the Board. Minor testified that a 2% LBP had been used by the city in evaluating who was the lowest responsible bidder in procurement of contracts. In her experience, the 2% LBP had an impact on the ability of local businesses to compete because it provided local businesses with a more level playing field in competing with suburban businesses that had lower operating or fixed costs as a result of being located outside the City of Chicago.

Minor testified that the city did undertake a study to quantify the allotted extra costs that it determined were associated with doing business in the city and it arrived at the 2% amount as a balancing factor. She believed that the 2% LBP was a success as used by the city, and it was her intent to obtain the same success for the Board. In Minor's experience, the 2% LBP allowed local companies to bid successfully and eventually, in some cases, actually bid lower than the nonlocal companies.

Minor relied upon the knowledge that she had from working with the 2% LBP while employed by the city. She did not hold any public hearings prior to presenting it to the Board. The Board did make the rule available for public commentary, but Minor did not recall any public commentary on the rule. The Board was familiar with the requirements of Rule 5.5 and its intended purpose at the time the Board voted on it. Rule 5.5 was presented to the Board and passed unanimously.

Minor testified that the four requirements of the 2% LBP were designed to improve education indirectly by improving the local communities. Companies located in the City of Chicago pay real estate taxes that go to support the public school system directly in terms of monies that go to education. Employment of city residents would lead to children who are better fed, clothed and housed and such children are better students.

Minor first became familiar with Best Bus and its members in July 1996, while reviewing all Board reports submitted for recommendation of the award of bus contracts. She was familiar with the provision of the Best Bus Joint Venture agreement that stated that Laidlaw may assign its responsibilities and duties under the agreement. She asked her staff whether it was aware of any assignment by Laidlaw. Minor's staff was unsure at that point. In any event, she considered the assignment provision irrelevant because the bid documents that she had and the information presented in the bid showed Laidlaw as the bidding partner and a member of the Best Bus Joint Venture. She agreed that if Willett had been the bidding member of

Best Bus rather than Laidlaw, Best Bus would have qualified for the 2% LBP.

Minor testified with regard to assignment that page 7 of the general conditions on the bid specifications requires that any assignee of rights under the contract file written notice of that assignment with the Board of Education. She testified that she did not receive any written notice of the assignment from Best Bus Joint Venture or Laidlaw. Minor testified that general conditions of the bid also prohibit delegation of performance without prior written consent of the Board. She testified that the Board never provided written consent to either Best Bus or Laidlaw to allow Willett to perform.

The Best Bus bid submission indicated that Laidlaw was a member of the joint venture, not Willett. Minor indicated that, if Best Bus had called and told her that the documents contained a mistake and that Willett was actually a member, she would have been unable to consider that information in evaluating the bid. She was required to evaluate the bids based on the information submitted in the bid. Prior to the lawsuit filed by Best Bus on July 25, 1996, no one from Laidlaw, Willett or Best Bus challenged the validity of the 2% LBP. They only challenged whether or not it should be applied to Best Bus.

Francisco DuPrey, director of student services of the Chicago Board of Education, testified that the assignment of bus routes takes approximately four to six weeks. The bureau of student services did not run an alternative routing process based on the pending lawsuit because this would have taken away from its ability to complete the initial routing process.

DuPrey testified that the Board transports approximately 50,000 students and that manipulating data in order to design routes is a cumbersome process. If the preliminary injunction were allowed, the bureau of student transportation would have to go back and begin the process from day one, including inspecting the Best Bus buses. He did not believe this could be done before school started since the bureau already had inspections scheduled through the end of August at the time of the hearing.

McNair Grant, director of the bureau of purchasing, testified that he was responsible for administering the 2% LBP for contracts adopted by the Board. He explained the bid specifications, including Rule 5.5, at the March 21 pre-bid meeting. After the pre-bid meeting, Grant was approached by Clifton Hudson, whom he recognized as representing Willett. Hudson asked him if Best Bus would be okay under this new rule. Grant told him to just make sure that he submitted all the documents. Grant's emphasis on supplying the documents

was to enable the Board to evaluate whether or not Hudson's joint venture was a local business. Grant stated that he would not promise Hudson that he would be considered a local business and that he did not indicate to Hudson that it was his opinion that Best Bus would be a local business. He stated that Hudson did not identify to which company he was referring, did not tell him he was inquiring about the locality of Laidlaw, and did not tell Grant that Laidlaw would be a member of Best Bus.

Grant did not have further contact with Hudson until the middle of July, at which time he requested additional information on Laidlaw to determine its eligibility as a local business. He called Hudson because Hudson was identified on the bid document as the manager of Best Bus Joint Venture. Grant asked Hudson to provide disclosure-of-ownership forms. The Board requested a Dun & Bradstreet report, which indicated that Laidlaw had 80,000 employees with the majority of its work force located outside the City of Chicago.

The Board did not as a regular matter of course allow parties to delegate performance of any obligations under contracts to wholly owned subsidiaries without prior written consent of the Board. The issue of an assignment to another entity had never previously impacted the question of whether there would be an award based on the 2% LBP because Rule 5.5 did not apply to those prior contracts.

Clifton Hudson, the president of Willett Motor Coach Company, testified that Best Bus Joint Venture had contracts with the Board before and after the purchase of Willett by Laidlaw. He believed that the joint ventures previously showed Laidlaw as one of the joint venture partners subsequent to the merger and that contract documents indicated at those times that Laidlaw might or would assign performance to Willett. In each of those cases, an assignment was made, but it was not done in writing, and no notice was given to the Board of the actual fact of assignment. Hudson testified that the Board never objected to Willett providing services on behalf of Laidlaw even though it knew that was occurring.

Hudson spoke with Grant after the March 21 pre-bid meeting. He asked whether Willett would be considered local. He did not tell Grant that Willett was not a bidder under the joint venture. At the time he spoke with Grant, the bid had not been submitted. Hudson admitted that after Grant told him that Willett would be considered local, Best Bus submitted its bid with Laidlaw as the joint venture member. He also admitted that the 1996 joint venture agreement did not anywhere indicate that Willett would be doing the bus service for Laidlaw.

According to Hudson, Best Bus submitted the material requested

by the Board in order to demonstrate that it was local. Best Bus did not challenge the validity of the 2% LBP during the pre-bid meeting, during the Board's analysis of the bids, or during the Board's meeting convened to hear public comment on the bids prior to voting on the awards. Hudson stated that Best Bus did not challenge the validity of the 2% LBP until Best Bus was informed it would not get the benefits of the preference.

Rachel Hubka is the president and owner of Rachel's as well as the chief operating officer for RR. RR is composed of two member bus companies, Rachel's Bus Company (Rachel's) and Reliable Bus Company (Reliable). Rachel's is certified as a "Women's Business Enterprise" (WBE). The purpose of the joint venture is to comply with the minority participation goals set by the Board for affirmative action.

Both Rachel's and Reliable were aware of the Board's adoption of the 2% LBP and had determined that RR qualified for the 2% LBP at the time RR submitted its bid. Hubka testified that Rachel's met the Board's qualifications for a local business, because Rachel's is authorized to do business in the City of Chicago, has offices and bus facilities in Chicago, has a license to do business in Chicago, has all its full- and part-time employees working in the City of Chicago, and pays the head tax imposed by the City of Chicago.

After reviewing the schedule of the various bids, Hubka determined that RR was entitled to the 2% LBP and that Best Bus was not entitled to the 2% LBP, and determined that RR would be awarded buses based on its bid and the application of the 2% LBP. She took certain steps in reliance on the fact that the Board would apply the 2% LBP in its determination of awards, such as renewing leases with various bus companies. When the Board notified RR of its award of type I buses, she expended monies to prepare the buses for the upcoming school year.

Rachel's revenues during the 1995-96 school year amounted to $4.5 million, of which less than 1% came from routes or vehicles other than those awarded by the Board. Other than the public school routes awarded under the bid, Rachel's has one year of a three-year contract left with the Board for six nonpublic school routes. Those routes alone are not sufficient to keep Rachel's in business without the Board's public school routes, and Rachel's would not be able to continue to service the nonpublic school routes without the award of the public school routes. Without the public school routes, Rachel's would lose all of its drivers, would not be able to maintain its leases on the vehicles or the property and would be forced to terminate its full-time and part-time staff.

Edmond Ellis, president and owner of Reliable, testified that Reliable does not have a parent or subsidiary relationship with any other company. He is also RR's administrative manager, responsible for the day-to-day contact and relationships with the Board. Reliable met the Board's qualifications for a local business. In reliance on the expectation that the Board would honor the integrity of the bid and apply the 2% LBP accordingly, Reliable took the same steps that Hubka testified about to prepare its buses for the school year, but with the additional step of submitting its vehicles for emission testing.

Reliable's revenues during the 1995-96 school year amounted to approximately $10 million, of which 1% to 2% percent came from routes or vehicles other than those awarded by the Board. Without the public school routes, Reliable would have to close one of its two facilities, would only be able to keep between 10 to 12 of its 50 full-time employees and would only be able to keep 130 of its 325 part-time employees.

The trial court denied Best Bus' motion under count I. The trial court found that Best Bus was not a local business as defined by Rule 5.5 and, therefore, not entitled to a 2% LBP. The trial court found that Laidlaw, not Willett, was the party to the joint venture agreement.

As to counts II, VII and VIII, the trial court found that Best Bus was estopped from challenging the validity of the 2% LBP.

Despite its ruling estopping Best Bus from asserting the invalidity of Rule 5.5, the trial court did rule on the constitutionality of the statute. The court rejected Best Bus' allegation that the 2% LBP violated the interstate commerce clause of the United States Constitution. However, the trial court accepted Best Bus' allegation that the 2% LBP is unconstitutional because the Board lacks statutory authorization.

The Board moved to reconsider that portion of the opinion ruling on the constitutionality of Rule 5.5. The Board's motion was denied. Plaintiffs moved to reconsider the trial court's findings. The plaintiffs' motion was denied.

We now address the validity of the local business preference.

■ The Illinois School Code requires that certain contracts be awarded to the lowest responsible bidder. 105 ILCS 5/34—21.3 (West 1994). The purposes for requiring public bodies to engage in competitive bidding are to invite competition, to guard against favoritism, improvidence, extravagance, fraud and corruption and to secure the best work or supplies at the lowest price practicable. *Compass Health Care Plans v. Board of Education*, 246 Ill. App. 3d 746, 751, 617

N.E.2d 6, 9 (1992); *O'Hare Express, Inc. v. City of Chicago*, 235 Ill. App. 3d 202, 208, 601 N.E.2d 846, 850-51 (1992). While the competitive bidding statute does not automatically compel the Board to award a contract solely on the basis of lowest cost (*S.N. Nielsen Co. v. Public Building Comm'n*, 81 Ill. 2d 290, 299, 410 N.E.2d 40, 44 (1980); *Court Street Steak House, Inc. v. County of Tazewell*, 163 Ill. 2d 159, 165, 643 N.E.2d 781, 784 (1994)), it does specify that the contracts be awarded to the "lowest responsible bidder" after due advertisement. 105 ILCS 5/10—20.21 (West 1994). It is the public body that specifies the terms of the contract for which it solicits bids and the criteria that bidders must meet in order to be considered a "responsible bidder." *Compass Health*, 246 Ill. App. 3d at 751, 617 N.E.2d at 9. Thus, the law is clear that a public body possesses great discretion in determining the lowest responsible bidder. Financial responsibility and ability to perform are not the only relevant factors. A contract may be awarded to a higher bidder, "where this is done in the public interest, in the exercise of discretionary power granted under the laws, without fraud, unfair dealing, or favoritism, and where there is a sound and reasonable basis for the award as made." 10 McQuillin on Municipal Corporations § 29.73a, at 407 (3d ed. 1966).

■ The Board has certain enumerated powers granted by the Illinois legislature. Specifically stated in the School Code is that "the board shall also exercise all other powers that *** may be requisite or proper for the maintenance and development of a public school system, not inconsistent with the other provisions in this Article *** which apply to all school districts." 105 ILCS 5/34—18 (West 1994). This section also empowers the Board to "approve programs and policies for providing transportation services to students." 105 ILCS 5/34—18(8) (West 1994).

While the Board possesses a broad range of powers to implement policies relating to education, it is limited to those powers expressly granted by law. The Illinois Constitution states that "school districts *** shall have only powers granted by law." Ill. Const. 1970, art. VII, § 8.

The Board argues that there is nothing in the School Code that prohibits the Board from including a local preference factor when determining who is the lowest responsible bidder. We think that the appropriate question is whether there is anything in the School Code that allows the Board to give preferential treatment to local businesses.

■ A reading of the School Code and the record before this court presents nothing that expressly authorizes the Board to create a local business preference. Section 29—6.1, which authorizes school

boards to enter into transportation contracts, does not provide any authority for preferences in bidding. Also, section 10—20.21, which enumerates the awarding of all contracts based upon the lowest responsible bidder, does not grant authority to create a local preference. The Board's Rule 5.5 appears to be designed to favor local business. As this court stated in *Cardinal Glass Co. v. Board of Education of Mendota Community Consolidated School District No. 289*, 113 Ill. App. 3d 442, 448, 447 N.E.2d 546 (1983), such favoritism, "without adequate and sufficient justification, *** would constitute arbitrary and capricious action." We believe that the 2% local business preference has no proper legislative authority and is an arbitrary and capricious delegation of power to a municipal unit and is therefore unconstitutional.

■ We now address whether Best Bus is estopped from challenging the validity of the 2% LBP.

On January 24, 1996, the Board adopted Rule 5.5, establishing a 2% local business preference for contracts over $10,000. A pre-bid meeting was held on March 21, 1996, at which time a representative from each member of the joint venture, along with Hudson from Willett, was in attendance. Prior to the pre-bid meeting, a list of revisions and additions from the previous contract containing the addition of the 2% LBP was made available to the public. The terms and conditions of the 2% LBP were described by McNair Grant at the pre-bid meeting, and those same terms and conditions are set forth in the Best Bus bid.

Every member of Best Bus, along with Willett, was aware of the 2% LBP by the March pre-bid meeting. Plaintiffs were aware that Laidlaw was not local, yet Laidlaw did nothing at this point to challenge the 2% preference. In fact, Hudson, president of Willett, asked Grant if his company would be okay under the new rule. He testified that he was inquiring about the status of Willett, not Laidlaw, since Laidlaw could not be considered local under Rule 5.5. At any rate, we do not accept Best Bus' argument that it relied upon the assurances of Grant and, therefore, thought that it would qualify as a local company. Best Bus knew before submitting its bid that it did not qualify as a local business because of Laidlaw, yet it still submitted a bid with Laidlaw listed as one of the joint venturers. Laidlaw, when requested by the Board, submitted documents without questioning the validity of the 2% LBP. It was only in late July when the awards were made and Best Bus was not awarded the type I buses that plaintiffs sought to invalidate the 2% LBP.

In *City of Wyoming v. Illinois Liquor Control Comm'n*, 48 Ill. App. 3d 404, 407, 362 N.E.2d 1080, 1082-83 (1977), the court held that

"a party who fails to assert the invalidity of an ordinance within a reasonable time after its passage[ ] is estopped from so asserting if the failure resulted from that party's lack of due diligence and the opponent has substantially changed his position in reliance on the ordinance." The Board had contracted with other vendors and developed bus routes to prepare for the school year by the time Best Bus challenged the validity of the 2% LBP. RR had incurred obligations in reliance on being awarded the contract. To grant relief to Best Bus would mean a rerouting of buses and schedules; rescinding current contracts with other vendors that, in reliance on receiving the award, prepared their buses and drivers and expended money in other related costs; awarding new buses to new vendors; and reinspection of buses.

Best Bus, after attempting to benefit from the 2% LBP, now cannot seek to challenge the Board's authority when not a beneficiary of the new rule. *Cochennet v. Ambrose*, 21 Ill. 2d 520, 524, 173 N.E.2d 454, 456 (1961) ("right to question the validity of a statute may be waived *** by any course of conduct which shows an intention to waive any question as to the validity of the statute"). While this court has ruled that the 2% LBP is invalid, we find that Best Bus is estopped from challenging the validity of this statute because it waited until it did not receive the benefits of the ordinance before contesting it.

Since we have determined that the 2% LBP is invalid and that Best Bus is estopped from asserting the ordinance's invalidity, we will not address the remaining issues.

Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

HARTMAN, P.J., concurs.

JUSTICE HOFFMAN, specially concurring:

I concur with the result reached by the majority in this case. I write specially, however, to register my disagreement with my colleagues on both substantive and procedural grounds.

The trial court's finding that Best Bus Joint Venture (Best Bus) was not a local business entity as defined by Rule 5.5 of the Board of Education of the City of Chicago (Board) is amply supported by the record. Laidlaw Transit's participation in the joint venture resulted in a majority of Best Bus's regular full-time work force being employed outside of the City of Chicago. Consequently, the trial court properly denied the plaintiffs requested relief under count I of their amended complaint.

I agree with the majority that Best Bus has waived the right to challenge the constitutionality of, or Board's authority to promulgate, the 2% local business preference (LBP) set forth in Rule 5.5 and the subject bid specifications. By participating in the Board's bidding process under Rule 5.5 and seeking to avail itself of the benefits of the 2% LBP without questioning the constitutionality of such a preference or the Board's power to enact it, Best Bus waived its right to challenge the validity of Rule 5.5 and the LBP on either statutory or constitutional grounds. See *Calabrese v. State Farm Mutual Automobile Insurance Co.*, 187 Ill. App. 3d 349, 543 N.E.2d 215 (1989). The trial court, therefore, properly denied the plaintiffs injunctive relief under counts II, VII and VIII of their amended complaint.

For the reasons stated above, and only for those reasons, I concur in the result reached by the majority in this case.

Substantively, I cannot agree that Best Bus was estopped to raise the invalidity of Rule 5.5 or the Board's LBP. Equitable estoppel is a doctrine that acts to preclude a party from asserting rights against another who, in good faith, relied upon the party's voluntary representations or conduct, and was thereby led to change its position for the worse. *Trochelman v. Village of Maywood*, 259 Ill. App. 3d 1, 631 N.E.2d 334 (1994); *Stoller v. Exchange National Bank*, 199 Ill. App. 3d 674, 557 N.E.2d 438 (1990). Nothing in the record in this case reflects that either the Board or RR Bus Service Joint Venture (RR Bus) changed its position in reliance upon any representation or conduct of the plaintiffs. Best Bus did not induce the Board to enact Rule 5.5 or the LBP; it did not induce the Board to advertise for bids; and it did not, by representation, action or inaction, induce RR Bus to participate in the subject bidding process. To my mind, the majority confuses waiver and estoppel. The doctrines are similar, but they are not identical.

Lastly, I believe that the majority should have refrained from addressing the validity of Rule 5.5 and the Board's LBP. Once having found that Best Bus did not qualify as a local business entity under Rule 5.5 and that it had waived the right to challenge either the rule or the LBP, nothing more need have been stated. Particularly troubling to me are the majority's constitutional findings. Constitutional questions should be avoided when the issue before a court can be decided on other grounds. *Rescue Army v. Municipal Court*, 331 U.S. 549, 568-69, 91 L. Ed. 1666, 1678, 67 S. Ct. 1409, 1419 (1947); *People v. Mitchell*, 155 Ill. 2d 344, 356, 614 N.E.2d 1213 (1993).